IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>   v.<br><br>JOHN CAMERON DENTON,<br>   a/k/a "Rape"<br>   a/k/a "Death"<br>   a/k/a "Tormentor"<br><br>   Defendant. | Case No. 1:20-mj-84 |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REVOKE DETENTION ORDER

The defendant, JOHN CAMERON DENTON, was arrested in the Southern District of Texas pursuant to a criminal complaint and arrest warrant charging him with conspiracy to transmit interstate threats to injure, in violation of Title 18, United States Code, Section 371. On March 10, 2020, the defendant appeared for his combined preliminary and detention hearing in this district before the Honorable Theresa Carroll Buchanan.   After the defendant waived his preliminary hearing, the Court found that there was probable cause in support of the criminal complaint.   The Court then held the detention hearing.

At the detention hearing, the government articulated facts that proved by clear and convincing evidence that there were no condition or combination of conditions of release that would reasonably assure the safety of any other person and the community.   These facts included the following: (i) the nature of the conspiracy charged; (ii) the defendant's role in that conspiracy — including the fact that he targeted journalists out of a desire to further his violent white supremacist organization; (iii) the weight of the evidence; (iv) the defendant's suspected

role in viewing and distributing child pornography; (v) the defendant's close association with at least one other white supremacist, who conspired to threaten journalists and other individuals; and (vi) the defendant's recent activities, which included conspiring to conduct cyber attacks attacks against Google.   The defendant argued that the proposed third-party custodians would ensure that he did not engage in acts that endangered the community.   The defendant also claimed that he was no longer a member of the violent white supremacist organization.   This claim, however, was refuted by the fact that the defendant expressed strong support for this violent organization in an undercover recording just a month prior to his arrest.

     After hearing argument and considering the facts articulated in the affidavit in support of the criminal complaint, the Court determined that the proposed third-party custodians would not ensure that the defendant no longer posed a continuing threat to the community, and ordered the defendant detained.   The defendant has now moved this Court for revocation of Judge Buchanan's detention order.   The defendant's motion offers neither new facts nor new arguments, with the exception that he now argues that the public health crisis posed by the outbreak of Coronavirus Disease 2019 ("COVID-19") counsels for his release from custody.

     The Court should deny the defendant's motion to revoke Judge Buchanan's detention order.   The defendant presents a significant danger to the community if released on bond.   As Judge Buchanan concluded, the conditions proposed by the defendant are insufficient to reasonably assure the safety of the community.   Because no condition or combination of conditions will reasonably assure the safety of the community, the defendant should remain detained pending trial pursuant to Title 18, United States Code, Section 3142(e)(1).

**Factual Background**

A.       **The Swatting Conspiracy**

Beginning in and around August 2018, a group of individuals began conspiring together to place "swatting" calls across the country. "Swatting" is a harassment tactic that involves deceiving dispatchers into believing that a person or persons are in imminent danger of death or bodily harm and causing the dispatchers to send police and emergency services to an unwitting third party's residential address.

At that time, John William Kirby Kelley ("Kelley") began hosting the Deadnet IRC channel, also known by the moniker "#Graveyard." Kelley is currently charged via criminal complaint in the Eastern District of Virginia with conspiracy to commit an offense against the United States; to wit, interstate threats to injure, in violation of Title 18, United States Code, Section 875(c), all in violation of Title 18, United States Code, Section 371 (1:19-mj-4). This Deadnet IRC channel became a gathering point for a group of conspirators, who plotted and conducted swatting calls together. The defendant joined this conspiracy in and around October 2018, when an uncharged co-conspirator informed him of the purpose of the channel and invited him to the channel. Upon joining the channel, the defendant began taking part in swatting calls.

The defendant and his co-conspirators were prolific at swatting. Indeed, the conspirators committed one of the most far-reaching and prolific swatting conspiracies known to law enforcement. During the course of the conspiracy, the defendant and his co-conspirators placed at least 134 swatting calls. The conspirators targeted people for different reasons. For instance, some conspirators proposed swatting individuals who were live streaming their activities. These targets were chosen because conspirators wanted to watch the law

enforcement response to the threatening phone calls. Other conspirators, including the defendant, chose targets because they were motivated by racial animus. These are but a few of the reasons why targets were chosen.

The conspirators conducted swatting calls in a similar manner. Often a co-conspirator ("Co-Conspirator 1") asked other co-conspirators in the #Graveyard IRC Channel to propose swatting targets. Co-Conspirator 1 and another co-conspirator ("Co-Conspirator 2") then chose from the options presented to them by the co-conspirators. Once Co-Conspirator 1 and 2 chose a target, the co-conspirators often used the Mumble application to listen to the swatting call in real time. Mumble is an open source Voice over Internet Protocol communication tool that permits users to speak with and listen to each other. The defendant was often present on these Mumble calls.

### B. The Defendant's Role in the Conspiracy

As stated above, the defendant joined the swatting conspiracy in and around October 2018. The defendant is the former leader of Atomwaffen Division in Texas. Atomwaffen Division[1] is a white supremacist organization that is present across the United States and in other countries. Atomwaffen Division is linked to several murders and other violent acts, including interstate threats against journalists and others.

Over the years, several journalists and news organizations have written about the defendant's activities and his role in Atomwaffen Division. The defendant was furious with several journalists, including a journalist (the "Victim") that worked for ProPublica, which is a non-profit newsroom that produces investigative journalism.

---

1 Atomwaffen means "nuclear weapons" in German.

The defendant turned to his co-conspirators to seek retribution against the Victim and ProPublica. On December 14, 2018, the defendant called the City of New York Police Department ("NYPD"), identified himself as a well-known white supremacist and stated that he was affiliated with Atomwaffen Division. The defendant claimed that he was located at ProPublica's office and that he had multiple pipe bombs, an AR 15, one hostage, and a dead body. The defendant said he would begin shooting at police once they arrived. This call prompted NYPD to respond and search ProPublica's office.

After swatting ProPublica, the defendant turned his focus to journalists. According to a co-conspirator, the defendant wanted the Victim doxed so that the group could then swat the Victim. "Doxxing" is a harassment tactic that involves researching and publishing personally identifiable information ("PII") about an individual, such as the person's date of birth, address, telephone number, or other unique identifiers, on the internet. PII can be obtained in a variety of ways, both legal and illegal.

After a fellow co-conspirator doxed the Victim, the defendant worked with Co-Conspirator 2 and another co-conspirator to enact his retribution. On February 8, 2019, the defendant, Co-Conspirator 2, and another co-conspirator called the Richmond Police Department, who are located in Northern California. Co-Conspirator 2 identified himself as the Victim and stated that he shot his wife with an M16. Co-Conspirator 2 initially refused to answer questions and stated that he was holding a loaded M16 and planned to shoot any officers that approached the residence, and then himself.

Local law enforcement responded to the Victim's home. Both the Victim and his wife were removed from their home and placed in separate police cruisers. The Victim's young son

and another relative were left in the home. The Victim explained that he had been receiving threats because he was a journalist who wrote about white supremacists. Law enforcement released the Victim and his wife and then let them reenter their home. The Victim and his family were shaken by these events.

On January 9, 2020, the defendant unknowingly had a meeting with an undercover law enforcement agent in his home. During the conversation, the defendant said he got his foot in the door with Deadnet conducting swatting calls. The defendant stated that he used a voice changer during calls, and that other conspirators silenced their microphones to listen.

The defendant stated that he swatted journalists who had reported on him. The defendant explained that he was able to view some of the swatting incidents on street cameras as the swattings unfolded. The defendant also specifically mentioned the swatting of ProPublica to the undercover agent. The defendant stated that he swatted ProPublica and the entire building had to be evacuated. He also told the undercover agent that he participated in the swatting of the Victim's home.

The defendant said that if he was "raided" for swatting ProPublica then it would be good for Atomwaffen Division because the swatting would be seen as a top-tier crime. The defendant stated that he did not expect the media to report on particular swatting events because of fear of how neo-Nazi followers might respond. He also speculated that such reports might encourage copycat swat calls.

Finally, the defendant informed the undercover law enforcement officer that he was then conspiring with others to conduct sophisticated cyber attacks against Google. The defendant indicated that he was not doing the computer programing.

### C.   The Defendant's Other Associations and Criminal Activities

At the detention hearing held before Judge Buchanan, undersigned counsel proffered additional facts to the court about the defendant's other criminal connections and activities.

First, law enforcement arrested both the defendant and his roommate, Kaleb Cole, on the same day (Case No. MJ 20-088, W.D. Washington).   Cole was the former leader of Atomwaffen Division in Washington.   Cole was arrested for his role in conspiring to threaten journalists and people associated with the Anti-Defamation League in Washington.   Cole and his co-conspirators targeted journalists who were Jewish or minorities.   Cole and his co-conspirators created posters, which included Nazi symbols, masked figures with guns and Molotov cocktails, and threatening language.   Conspirators then delivered some of these threats.

Second, law enforcement obtained credible evidence that the defendant has possessed and distributed child pornography.   Undersigned counsel proffered facts obtained from two co-conspirators.   According to both co-conspirators, the defendant scanned and sent nude photographs of a 16-year old girl who had dated another white supremacist.   According to one of the co-conspirators, the defendant had sent him links to multiple images, which the defendant claimed were of child pornography.   After the co-conspirator opened one image, which the conspirator believed captured a young underage girl, he chose not to open other images sent by the defendant.   This same co-conspirator also stated that the defendant uploaded additional child pornography to a temporary image folder.   The second co-conspirator stated that the defendant traded child pornography back and forth with another white supremacist.

**Standard of Review**

A review of a detention order is conducted de novo.  *See United States v. Clark*, 865 F.2d 1433, 1436 (4th Cir. 1989).

**Argument**

In a pretrial detention hearing, the government's burden is to establish by clear and convincing evidence that no conditions of release will reasonably assure the safety of the community.  *See* 18 U.S.C. § 3142(f)(2)(B).  When making a determination regarding the eligibility of a defendant for pretrial release, the Court must consider the following factors: (1) the nature and circumstances of the offense (in particular whether it is an offense which is violent or nonviolent in nature); (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g). These factors counsel for the defendant's detention.

    **A.**    **Nature and Circumstances of the Offense**

First, the defendant has conspired to commit a crime of violence.[2]  As detailed above and more thoroughly in the affidavit in support of the criminal complaint, this was a prolific conspiracy.  The co-conspirators placed at least 134 swatting calls.  In these calls, the conspirators claimed that they placed bombs in specific locations, murdered individuals, held individuals hostage, intended to shoot responding law enforcement officers, and transmitted

---

[2] While conspiracy is generally not a crime of violence, making interstate threats to injure, in violation of 18 U.S.C. § 875, is a crime of violence.  The elements of this offense are: (1) that the defendant knowingly transmitted a communication in interstate or foreign commerce; (2) that the defendant subjectively intended the communication as a threat; and (3) that the content of the communication contained a "true threat" to injure.

other threats. Many of these calls prompted a law enforcement response and caused emotional distress.

Indeed, the defendant took part in two swatting calls that issued violent threats and resulted in emotional distress to others. In the swatting call to NYPD, the defendant stated that he was located at ProPublica's office in New York City. The defendant claimed that he had multiple pipe bombs, an AR 15 rifle, one hostage, and a dead body. The defendant then stated that he would begin shooting at police when they arrived.

In response to this swatting call, the NYPD responded to ProPublica's office with approximately a dozen officers. The initial responding officers determined that the threat did not appear credible. As a result, the NYPD chose to limit its response to the initial responding officers. NYPD officers cleared the 13th floor, which is where the purported threat was located. During the operation, the NYPD found a single employee in the office. This employee was visibly shaken by the threat and police response.

In the swatting call to law enforcement in Northern California, Co-Conspirator 2, with the defendant also on the phone call, claimed to be the Victim, and further stated that he shot his wife, he would shoot any law enforcement officers who responded to the residence, and threatened to kill himself. In response to this swatting call, law enforcement responded to the Victim's home. Law enforcement removed both the Victim and his wife from their home and placed them in separate police cruisers. Law enforcement permitted the Victim's young son and another relative to remain in the home. The Victim and his family were shaken by these events.

Based on the violent nature of the conspiracy and the defendant's role in choosing at least two targets out of a desire for retribution, there can be no doubt that the defendant poses a continuing danger to the community.

### B. Weight of the Evidence

Second, there is overwhelming evidence that the defendant took an active part in this violent swatting conspiracy. In January 2020, the defendant admitted in a recorded meeting with an undercover law enforcement officer that he swatted ProPublica's office and the Victim. The defendant described the conspiracy and named at least one co-conspirator. The defendant's admissions are fully corroborated by other evidence in this case, including, but not limited to, co-conspirator statements and the presence of the defendant in the IRC channel where the conspirators orchestrated the swatting calls.

### C. The Defendant Poses a Danger if Released

Third, the defendant poses a serious danger to community if he is released. As stated above, the defendant not only took part in a violent conspiracy, he targeted journalists who wrote articles about him that he found less than flattering. Based on the defendant's actions, there is every reason to believe that he will continue to target journalists and others who have written about Atomwaffen Division and himself. Moreover, at the time of the defendant's arrest, he was conspiring with others to commit sophisticated cyber attacks, and living with a fellow Atomwaffen member, who was then committing crimes. There is overwhelming evidence that the defendant remains committed to Atomwaffen Division and conspiring with others to commit crimes to further Atomwaffen Division's agenda.

### D. The Proposed Third-Party Custodians Cannot Ensure the Safety of the Public

In response to this overwhelming evidence, the defendant asserts that his father and grandfather are well situated to serve as third-party custodians.[3] In support of his claim, the defendant states that he is close to both individuals and has lived near them his entire life. To the contrary, this is exactly why neither individual is an appropriate third-party custodian. Since a ProPublica article was published in February 2018, it has been public knowledge that the defendant occupied a leadership role in Atomwaffen Division and discussed violent activity. After this article was published, the defendant joined the instant conspiracy, targeted at least one journalist and news organization, and began conspiring with others to commit cyber attacks. The defendant committed all these acts when he lived close to his father and grandfather. He also committed these acts when both his father and grandfather should have been on notice that the defendant was involved in planning violent acts. As such, neither the defendant's father nor grandfather are appropriate third-party custodians.

The defendant also claims that a GPS monitoring device will assure the safety of the public. It will not. The defendant used electronic devices to successfully transmit violent threats. While GPS monitoring devices can be effective in ensuring that a defendant appears for future court proceedings, they are not effective in preventing individuals from using electronic devices to commit future crimes.

---

3 At the defendant's detention hearing, he argued that Elizabeth Ellis would be an appropriate third-party custodian. Based on the Pre-Trial Services report, it was unclear whether the defendant and Ms. Ellis had ever met in person. The information provided only indicated that the defendant and Ms. Ellis had met on Facebook approximately five years ago. Further, Ms. Ellis had a full-time job and lived with another male. The Pre-Trial Services report contained no information on this other male. The government argued that Ms. Ellis was not an appropriate third-party custodian because it was unclear if she had ever met the defendant, was fully aware of his charges, and because she worked a full-time job. The defendant does not appear to be arguing that Ms. Ellis is an appropriate third-party custodian; however, the government renews its objection to Ms. Ellis.

### E. Concerns Related to COVID-19

The defendant claims that he should be released because the Court and the Alexandria Detention Center ("ADC") have responded to the COVID-19 crisis with measures that limit his rights. First, the Court's policies, which include the suspension of the grand jury, affect incarcerated and released defendants equally. Second, while the government does not underestimate the challenges that defense counsel currently face when attempting to advise their clients, the response to these challenges is to seek accommodations from the Court. The answer is not to release defendants who have shown they are a danger to the community. Moreover, if the defendant is released then he would travel to Texas. Due to current travel restrictions, the government assumes that defense counsel would be unable to travel to Texas to meet with his client. Therefore, whether the defendant is detained or released on conditions, defense counsel will be conducting video conferences with the defendant.

Finally, the defendant asserts that he should be released because he could contract COVID-19 in ADC. While the government is mindful of the COVID-19 pandemic, there have been no reported COVID-19 cases at ADC. ADC has taken substantial steps to mitigate the effects of the pandemic, including limiting in-person meetings between defense counsel and defendants. *See* Attachment A. At this time, therefore, there are no facts to support that the defendant is at risk of contracting COVID-19 while incarcerated at ADC.

**Conclusion**

The facts above establish by clear and convincing evidence that no conditions of release will reasonably assure the safety of the community. The government therefore respectfully requests that this Court detain the defendant pending trial.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:    /s/
Carina A. Cuellar
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Email: carina.cuellar@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2020, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send an electronic copy to the following address:

Andrew M. Stewart, Esq.
2007 15th Street North, Suite 201
Arlington, VA 22201
Phone: (703) 248-0626
Email: andrew.m.stewart.esq@gmail.com

                    Respectfully submitted,

                    G. Zachary Terwilliger
                    United States Attorney

By:    /s/
                    Carina A. Cuellar
                    Assistant United States Attorney