IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:20-cr-154 (LO) |
| JOHN CAMERON DENTON,<br>a/k/a "Rape"<br>a/k/a "Death"<br>a/k/a "Tormentor"<br><br>Defendant. | |

**POSITION OF THE UNITED STATES**
**WITH RESPECT TO SENTENCING**

The defendant, John Cameron Denton (the "defendant"), comes before the Court for sentencing after pleading guilty to conspiring to transmit in interstate and foreign commerce any communication containing any threat to injure the person of another, in violation of Title 18, United States Code, Section 875(c), all in violation of Title 18, United States Code, Section 371. This was a far-reaching conspiracy in which conspirators made at least 134 threats to injure against both individuals and institutions.    Many of the most influential conspirators, including the defendant, targeted both individuals and institutions for racist reasons.

The United States has reviewed the Presentence Investigation Report prepared in this case and has no objections.    The United States agrees with the Probation Office that the properly calculated guideline range is 51 to 60 months.    For the reasons set forth below, the United States asks this Court to impose a sentence of 60 months of imprisonment.

I.    Factual and Procedural Background

    A.    Background on the Conspiracy and the Defendant Joining the Conspiracy

In and around 2018, fellow co-conspirator, John William Kirby Kelley ("Kelley") (1:20-cr-82), began hosting the #Graveyard Internet Relay Chat channel (the "Graveyard channel") on the Clearnet, which refers to the traditional World Wide Web that is accessible through Google, another search engine, and by typing in the domain.   An Internet Relay Chat ("IRC") is like an internet chat room in that it enables both one-on-one and group communications in "forums," also known as "channels."

In and around August 2018, Kelley welcomed other participants to the Graveyard channel, including Co-Conspirator 1, who is a Canadian citizen, Co-Conspirator 2, who is a British citizen, and Co-Conspirator 3, who is an American citizen and was then a juvenile. Then, in around October 2018, the defendant, who is a former leader of the Atomwaffen Division in Texas, joined the others in the Graveyard channel.   The Atomwaffen Division is a US-based racially or ethnically motivated violent extremist group with cells in multiple states. The group's targets have included racial minorities, the Jewish community, the LGBTQ community, the US Government, journalists, and critical infrastructure.   The Atomwaffen Division reportedly has international ties and some members have traveled abroad, likely to meet with like-minded individuals.

The defendant joined the Graveyard channel around this time, in part, because a journalist obtained the chat logs from a white supremacist Discord chatroom[1]  where the

---

[1]  Discord is an instant messaging and digital distribution platform where users can communicate with voice calls, video calls, text messaging, media, and files in private chats or as part of communities called "servers."

defendant served as a moderator.    After this event, the group of white supremacists looked for a new forum where they could privately communicate.    Many in this group, including the defendant, moved to the Graveyard channel.    The conspirators chose to use monikers while accessing the Graveyard channel, which had the added benefit of concealing their identities. The defendant used the monikers "Rape" and "Tormentor."

Beginning in and around October 2018, the conspirators began transmitting interstate threats.    More specifically, the conspirators began proposing and choosing targets to "swat" in the Graveyard channel.    "Swatting" is a harassment tactic that involves deceiving dispatchers into believing that a person or persons are in imminent danger of death or bodily harm, which then causes the dispatchers to send police and emergency services to an unwitting third-party address.    After choosing a victim to swat, the conspirators often used the Graveyard channel to communicate in real time before, during, and after the swatting events.

The conspirators were most active between October 2018 and February 2019.    During this period, the conspirators swatted at least 134 different locations.    The conspirators selected high profile targets including government officials, executives, and journalists.    The conspirators also targeted individuals streaming live videos because the conspirators hoped to observe law enforcement responding to their calls.    Many of the conspirators, including the defendant and Co-Conspirators 1, 2, and 3, also chose targets because they were motivated by racial animus.

Indeed, during this same period, the defendant had his own active IRC channel, which he called #Siege Culture (the "Siege Culture channel").    The defendant named the Siege Culture channel after James Mason's writings, which first appeared in the Siege newsletter.    Mason is a

neo-Nazi, whose writings inspired the Atomwaffen Division.    For much of this time, the defendant was a leader of the Atomwaffen Division in Texas.    Further, the defendant had frequent contact with Mason, was inspired by him, and helped organize Mason's writings.    In his writings, Mason states that Nazis will not be able to take power as long as the existing US government remains in place.    Mason has also advocated murder and violence to create chaos and anarchy to destabilize the US government.

The Siege Culture channel was for conspirators with white supremacist views. According to cooperating witnesses and conspirator statements in the Graveyard channel, the defendant primarily communicated in the Siege Culture channel and through private chat to limit who could see his communications.    Further, conspirators discussed potential swatting targets in the Siege Culture channel.    The Siege Culture channel is referenced in the below Graveyard channel chat logs, which took place on October 24, 2018.

> [03:08] <+zheme> please carl
>
> [03:08] <+zheme> you know i need this
>
> [03:09] <04~carl> loldongs
>
> [03:09] <+zheme> my balls are already sore from tonights beating of the cock
>
> [03:09] <@GLITCH> toast, did carl just get you?
>
> [03:09] <+zheme> i have used almost 2 cups worth of lube
>
> [03:09] <@GLITCH> damn son
>
> [03:09] <&Toastsgnodlol em dNIOJAS eh <
>
> [03:09] <@GLITCH> topjej
>
> [03:09] <+zheme> and im too lazy to take a shower, so i smell like baby lotion

4

[03:09] <+zheme> i will use baby lotion to fuck a baby-sized pocket pussy

[03:09] <04~carl> !aq 6   <zheme06> my balls are already sore from tonights beating of the cock

[03:09] <@WEATHER> Quote #49 has been added.

*[03:10] <04~carl> zheme: rape is shittalkin u rn in #sc*

[03:10] <+zheme> im thinking of taking zinc and magnesium to make my cum pearly white

[03:10] <04~carl> saying how bad you are at chess

[03:10] <@saevyl> I wonder if I can make my voice into monokuma with a neural net

[03:10] <04~carl> into what

[03:11] <@saevyl> monokuma

Here, the defendant is communicating with "carl" (Kelley) in the Siege Culture channel. Above, "carl" (Kelley) comments to zheme that the defendant "is shittalkin u rn in #sc."   Here, #sc refers to the Siege Culture channel.   Unfortunately, law enforcement was unable to obtain any chat logs from the Siege Culture channel.

    B. How the Conspiracy Executed Swatting Calls

    The conspirators used the Graveyard channel and, to a lesser extent, the Siege Culture channel to coordinate and plan the swatting events.   Co-Conspirators 1 and 2 were the most prolific swatters.   Co-Conspirator 1 often asked other conspirators in the Graveyard channel to propose swatting targets.   Co-Conspirators 1 and 2 then chose the target from the options presented by fellow conspirators, including the defendant.   Once Co-Conspirators 1 and 2 chose

a target, the defendant and other conspirators often used the Mumble application to listen to the swatting calls in real time.   Mumble is an open source Voice over Internet Protocol ("VoIP") communication tool that allows users to speak with and listen to each other.   The defendant listened to and took part in number of swatting calls through Mumble.

The conspirators were able to successfully conceal their identities from law enforcement by using VoIP technology when placing calls.   The VoIP calls were made using the Google Voice services associated with email accounts kasseybaby99.s@gmail.com, jhulxo1000@gmail.com, and other email addresses.   In setting up these accounts, the conspirators used information not readily attributable to the conspirators.   Google logged the calls placed by many of the accounts.   The conspirators also used voice changers to disguise their real voices.   Indeed, during a recorded conversation with an undercover law enforcement officer, the defendant admitted to using a voice changer during calls.

Law enforcement finally began to unravel this international conspiracy when the conspirators targeted a then serving United States Cabinet member.   After this event, which is further described below, federal law enforcement opened an investigation.   Over the course of several months, law enforcement were able to identify that the telephone number used in this swatting event was a VoIP number subscribed to the same Google email account, jhullxo1000@gmail.com, used to swat a number of other victims in this case.   As a result, federal law enforcement worked with countless other law enforcement agencies to identity the victims in this conspiracy and the individuals that perpetrated this crime.

While the conspirators placed over 134 swatting calls, this sentencing paper will focus on the swatting events that occurred within the Eastern District of Virginia and the defendant's

vendetta against ProPublica and a ProPublica journalist (the "Victim").

      C.   <u>The Swatting of the Alfred Street Baptist Church in Old Town, Alexandria</u>

On November 3, 2018, at approximately, 7:02 p.m., a caller used a blocked phone number to contact the Alexandria Department of Emergency Communications ("DEC") non-emergency administrative line.   The caller identified himself as "George" and advised that he placed three pipe bombs at the Alfred Street Baptist Church and was going to "blow it up."   The caller stated the word "shooting" and that the caller was going to kill everyone at the church. Additionally, the caller advised he had control over the bombs and would not specify their location.

When the Alexandria Police Department ("APD") responded to Alfred Street Baptist Church, they found parishioners inside worshipping.   While the parishioners sheltered in place, APD set up a perimeter and used K9 units to sweep the interior and exterior of the building. The explosive sweep produced negative results and APD cleared the scene.   After determining this was a false bomb threat, APD opened an investigation.

Based on its investigation and interviews with conspirators, law enforcement learned that the conspirators used Google Voice services associated with email account kaseybaby99.s@gmail.com to place the swatting call.   Federal investigators later linked this email to countless other swatting calls, including swatting calls placed to Old Dominion University.   Through further investigation, law enforcement identified Co-Conspirator 3, who was a juvenile during the events of this conspiracy.   Co-Conspirator 3 admitted that he chose the Alfred Street Baptist Church as a target because its parishioners were predominantly African American.

Critically, Co-Conspirator 3 was a juvenile during the swatting attacks in this conspiracy. Co-Conspirator 3 met the defendant in the white supremacist Discord chatroom discussed above. The defendant served as moderator for this chatroom and often discussed Mason's neo-Nazi teachings with Co-Conspirator 3.   The defendant was aware that Co-Conspirator 3 was a juvenile; however, he encouraged Co-Conspirator 3 to join the Atomwaffen Division when he turned eighteen years old.

    D.   <u>The Swatting of Old Dominion University in Norfolk, Virginia</u>

As stated above, Kelley proposed swatting targets on several occasions and was a regular presence in the Graveyard channel, which he hosted.   On November 4, 2018, Kelley was particularly active.   First, he was online during a swatting event and proposed multiple swatting targets.   After a swatting call ended, Kelley proposed his university, Old Dominion University ("ODU"), as a potential target.   A few days later, Kelley, speaking as "carl," reminded conspirators in the Graveyard channel about swatting ODU.

On November 29, 2018, the conspirators executed their first swatting call against ODU. At approximately 2:08 a.m., ODU Police Department ("ODUPD") received a phone call from a blocked number.   The caller stated they were armed with an AR-15 and had placed multiple pipe bombs within the campus buildings.   The caller disconnected the first call with ODUPD and called back at 2:26 a.m.

At approximately 4:56 a.m., ODUPD received another call.   During the call, the individual apologized for making an accidental phone call.   The dispatcher then contacted the investigating officer about this phone call.   ODUPD compared the voice in the threatening phone call to the call received at 4:56 a.m. and determined that the two calls were likely made by

the same individual.   ODUPD identified Kelley as the caller through school records, which listed his phone number.

After identifying Kelley, ODUPD located and interviewed him.   During his interview, Kelley acknowledged "I have been around for calls in the past."   Kelley later discussed his time spent reviewing swatting calls and videos on YouTube and Twitter.   Kelley also acknowledged that he made the call at 4:56 a.m.; however, he did not speak about the actual swatting call.

In response to the swatting call, ODUPD called in every law enforcement officer in the department.   ODUPD contacted the Virginia State Police and the Norfolk Police Department to use their K9 officers.   The Norfolk Police Department SWAT Team was put on standby to assist with the response to the threat.   ODU also closed and professors were not permitted to return to the school.   Further, ODU issued a shelter in place for the students on campus and students were not permitted to leave their dorms except to visit the dining facilities.   Law enforcement subsequently searched and cleared every building on the ODU campus.

The conspirators swatted ODU again a few days later.   On December 4, 2018, at approximately 7:03 a.m., ODUPD received another phone call from a blocked number on their non-emergency line.   During the call, the caller stated he was located in the Webb Center, which is a gathering place for students where they can study and eat, and that he was in possession of a 9mm Glock and was going to shoot everyone in the building.   The caller either played a prerecorded swatting event or played excerpts from the prior swatting call made to ODU on November 28, 2018.

In response to this swatting call, ODUPD directed all on duty officers to the Webb Center.   The officers then cleared the building.   A thorough search of the building confirmed

that there were no threats.

After law enforcement spoke to Kelley, Kelley reentered the Graveyard channel and continued as an active participant.   He also informed his conspirators, including the defendant, that law enforcement spoke to him.   The defendant was concerned that Kelley's actions would result in law enforcement action.   For instance, on December 5, 2018, the defendant's conspirators discussed his concern that law enforcement may arrest Kelley in the below exchange.

[15:37] <%WEATHER> [93] for any questions or concerns about New Hope's SWAT situation capabilities, please email George LolDongs: newhopeswateval@hotmail.com

[15:37] <+zeem> !rq

[15:37] <%WEATHER> [1] Initializing public quotes system for the graveyard....

[15:44]<~Co-Conspirator 2>saevyl
https://www.imdb.com/title/tt0493459/videoplayer/vi3958767897?ref_=tt_ov_vi

[15:45] <+zeem> why was the irc down all morning Co-Conspirator 2

[15:46] <~ Co-Conspirator 2> No idea

[15:46] <~"Zim"> no

[15:46] <~ Co-Conspirator 2> It was online

[15:46] <+zeem> why couldnt i connect then

[15:46] <~c Co-Conspirator 2> Just wouldn't let anyone reconnect

[15:46] <+zeem> o

[15:46] <~ Co-Conspirator 2> Yeah same

[15:46] <+zeem> it is a conspiracy

[15:46] <~ Co-Conspirator 2> Mumble was been online all night

[15:46] <+zeem> was been

[15:46] <~ Co-Conspirator 2> yeah

[15:47] <+zeem> i need something to read

[15:47] <+zeem> i dont wanna read that march of the titans because im bored of history

*[15:47] <+zeem> rape is afraid that carls gonna get arrested*

[15:57] <@wil> by the mounties? loldongs

[15:58] <+zeem> yes

[15:59] <+zeem> wil yyyyyy

[16:12] <+zeem> god

E.   <u>Swatting of a Cabinet Member living in Alexandria, Virginia</u>

The conspirators also swatted high profile people.    For instance, on January 27, 2019, at approximately 2:44 a.m., an individual called the APD non-emergency line and provided an address belonging to a USSS protectee, who was then a United States Cabinet member.    The caller stated he had an AR-15, shot and killed his girlfriend, had her two children tied up in the laundry room and he would kill them if he did not speak to the hostage negotiator, and that he had a pipe bomb that he would detonate.    APD immediately contacted the USSS, who confirmed that the Cabinet member was safe and that APD assistance was not needed.

Law enforcement later determined that this call was placed by Google Voice services using the Google email account jhullxo1000@gmail.com.    This Google email was used in countless other swatting calls associated with this conspiracy.

F.  The Defendant's Swatting of ProPublica and a Journalist

The defendant, who as stated above, is a former leader of the Atomwaffen Division in Texas, often expressed his hatred for journalists and media outlets whose articles discussed white supremacist groups and individuals associated with the groups.   The defendant was particularly angry with ProPublica and with the Victim, who was a journalist with ProPublica, for reporting on the defendant's activities with Atomwaffen Division, including in a PBS Frontline documentary.

Co-Conspirator 3 was aware of the defendant's anger and desire for revenge against the Victim.   Co-Conspirator 3 decided to introduce the defendant to Co-Conspirator 2, who was also motived by his own racist views when he selected targets to swat.   The defendant discussed the Victim and other journalists with whom he was angry with because of the negative articles those journalists wrote about neo-Nazi groups.   The defendant discussed wanting to "dox" and then swat the Victim.   "Doxing" is a harassment tactic that involves researching and publishing personally identifiable information about an individual, such as the person's date of birth, address, telephone number, or other unique identifiers, on the internet.   Personally identifiable information can be obtained in a variety of ways, both legal and illegal.

On or about December 14, 2018, the defendant set in motion his plan to seek retribution when he participated in a call made to law enforcement in New York City.   During this swatting call, a conspirator provided a name and stated that he was affiliated with the Atomwaffen Division.   The conspirator stated that he was located at ProPublica's office in New York City. The conspirator further claimed that he had multiple pipe bombs, an AR 15 rifle, one hostage,

and a dead body.   The conspirator stated that he would begin shooting at police when they arrived.

In response to this swatting call, the City of New York Police Department ("NYPD") responded to ProPublica's office with approximately a dozen officers.   The initial responding officers determined that the threat did not appear credible.   As a result, the NYPD chose to limit its response to the initial responding officers.   NYPD officers cleared the 13th floor, which is where the purported threat was located.   During the operation, the NYPD found a single employee in the office.   This employee was visibly shaken by the threat and police response.

On or about February 8, 2019, the defendant, Co-Conspirator 2, and Co-Conspirator 3 executed the defendant's retribution against the Victim, when they participated in a call to law enforcement located in Richmond, California.   Co-Conspirator 2 claimed to be the Victim and further stated that he shot his wife, he would shoot any law enforcement officers who responded to the residence and threatened to kill himself.

In response to this swatting call, law enforcement responded in force to the Victim's home in the middle of the night.   Law enforcement handcuffed and removed both the Victim and his wife from their home and placed them in separate police cruisers.   When this happened, the Victim's young son and elderly relative were woken from their sleep.   Law enforcement permitted the Victim's young son and his elderly relative to remain in the home.   During this fraught encounter, the Victim explained that he had been receiving threats because he was a journalist and had written about white nationalists.   After some time, law enforcement released the Victim and his wife and let them reenter their home.

13

As described in the Victim impact letter, this swatting event was the culmination of nearly six months of threats.   In the period prior to this event, the Victim received a deluge of threats and his family was doxed by neo-Nazis, who called the Victim a "mongrel" because of his ethnic background.   After this doxing, unknown individuals used the personal information released to seize control of the Victim's relatives' digital lives, including their email accounts, iCloud accounts, and credit cards.

G.   The Defendant Proudly Boasted of His Role in this Conspiracy to an Undercover Law Enforcement Officer

On January 9, 2020, the defendant unknowingly had a meeting with an undercover federal law enforcement officer in his home.   During the conversation, the defendant said he got his foot in the door with IRC channels by conducting swatting calls.   The defendant further stated that he used a voice changer during calls and that other conspirators silenced their microphones to listen.

The defendant stated that he swatted journalists who had reported on him.   He further explained that he was able to view some of the swatting incidents on street cameras as the swattings unfolded.   The defendant also admitted that he swatted ProPublica and that the entire building had to be evacuated.   He further told the undercover law enforcement officer that he participated in the swatting of the Victim's home.

The defendant even boasted that if he was "raided" for swatting ProPublica then it would be good for the Atomwaffen Division because the swatting would be seen as a top-tier crime. The defendant also expounded that he did not expect the media to report on particular swatting events because of fear of how neo-Nazi followers might respond.   He also speculated that such reports might encourage copycat swat calls.

14

During this meeting, the defendant also mentioned that he wanted to swat a journalist in the United Kingdom for writing articles about neo-Nazis and identifying the defendant as a member of the Atonwaffen Division.   This is consistent with Co-Conspirator 3's statement that the defendant and conspirators settled on sending this journalist harassing messages because they were unable to locate the journalist's home address   Moreover, also during this conversation, the defendant admitted that he was able to take down a United Kingdom journalist's website that he targeted with conspirators.   The defendant explained that they targeted this journalist because of articles he had written about him and his affiliation with the Atomwaffen Division and neo-Nazis.

H.  Conspirators Used the DoxBin Site to further Target Individuals

From in and around October 2018, the conspirators also maintained a dark net site known as DoxBin.   The site was a repository of the personally identifiable information of potential and past swatting targets.   The conspirators placing a gun symbol next to the name of a person to indicate that the individual had been swatted.   The DoxBin website primarily targeted government officials, judges, executives, journalists, and celebrities.   The defendant took part in doxing individuals.

II.   The Guideline Range is Appropriately Calculated

The defendant has objected to the inclusion of the three-level and six-level enhancements given under victim related adjustments pursuant to USSG Sections 3A1.1(a) and 3A1.2(a) and (b).[2]   Kelley also objected to these same enhancements and the Court properly ruled against

---

[2] Undersigned counsel consulted with both the Probation Office and defense counsel to confirm that the defendant still objects to the application to the two guideline enhancements.   This section is written without the benefit of reviewing the defendant's particular arguments.   The

these objections.    This Court should rule the same way in this case.    Indeed, the evidence

supporting the application of these enhancements is even stronger against this defendant, who

was a member of and a leader in the Atomwaffen Division.

> A.    The § 3A1.1(a) Enhancement (Hate Crime Motivation) Applies in this Case
> Because this Conspiracy Had as an Object Selecting Victims Based on Their Race
> and Religion

Under § 3A1.1(a) of the Sentencing Guidelines, there is a three-level increase if the

defendant "intentionally selected any victim or any property as the object of the offense of

conviction because of the actual or perceived race, color, religion, national origin, ethnicity,

gender, gender identity, disability, or sexual orientation of any person."    For subsection (a) to

apply, the hate crime motivation must be proved beyond a reasonable doubt, even if the

defendant is sentenced by the Court after pleading guilty or *nolo contendere*.    *See* § 3A1.1(a);

Application Note Background (explaining history of hate crime enhancement).    The standard

for proving hate crime motivation for purposes of the sentencing enhancement is no more

burdensome than for proving statutory animus.    *See United States v. Smith*, No. 08-10386, 2010

WL 510634, at *6 (9th Cir. Feb. 12, 2010) (unpublished) (holding that there is "no textual basis

for applying a different standard to the sentencing than to the conviction for hate crimes").    In

this case, the uncontested facts as set forth in the Criminal Information and Statement of Facts

establish beyond a reasonable doubt that the conspirators selected victims, in part, because they

were motivated by racial animus.

Here, both the Criminal Information and Statement of Facts detail that the conspirators

chose victims for several reasons.    The Criminal Information states: "It was further part of the

United States is prepared to address any unresolved questions in court.

conspiracy that some members of the conspiracy were motivated by racial animus when they chose which individuals and locations to swat." Dkt No.37 at pg. 4. The Criminal Information then details the swatting of the Alfred Street Baptist Church, which is a predominantly African American church in Old Town Alexandria. *Id.* at 5.

Moreover, the Statement of Facts details that the defendant knew his conspirators were motivated by racial animus when they chose targets to swat. First, the Statement of Facts outlines that conspirators chose targets for different reasons, including "[s]ome co-conspirators also chose targets because they were motivated by racial animus." Dkt No. 40 at pg. 3. It then goes one step further and states:

> In particular, the Defendant, Co-Conspirator 2, and Co-Conspirator 3 expressed white supremacist views. The Defendant communicated with these individuals about his white supremacist views and used racial epithets. Both Co-Conspirator 2 and 3 chose targets based on their white supremacist views. And, as further explained below, the Defendant chose to target an individual and a news organization because they exposed his real identity and participation in Atomwaffen Division, which is a white supremacist organization that is present across the United States and in some other countries.

*Id.*

Moreover, these statements are not made in a vacuum. The defendant was a leader of the Atomwaffen Division in Texas and moved to the Graveyard channel after journalists obtained chat logs from his white supremacist chatroom on Discord. After this happened, the defendant, Co-Conspirator 3, and other white supremacists looked for a new medium where they could privately chat. The Graveyard channel was this new medium. After joining the Graveyard channel, the defendant also had someone set up the Siege Culture channel, where the conspirators devoted to white supremacy could privately communicate. By all accounts, including the Statement of Facts and the defendant's admission to an undercover law

17

enforcement officer, the defendant was present during swatting calls, took part in swatting calls, and was fully aware of and motivated by his white supremacist views when choosing locations to swat.    Further, the chat logs and witness statements establish that the defendant was active in November and December 2018, which is when the conspirators swatted two predominantly African American churches and an Islamic Center.

The uncontested facts therefore establish that the defendant, a former leader of a racially or ethnically motivated violent extremist group and a devoted follower of Mason, joined the Graveyard channel and this conspiracy to further his white supremacist views.    The uncontested facts therefore prove that the defendant was a knowing and active member in a swatting conspiracy that targeted individuals and locations based on race and religion.    In addition, the defendant was deeply familiar with three of the conspirators targeting victims for racial and religious reasons.    The defendant therefore knowingly conspired with individuals who targeted individuals and locations for racial and religious reasons.

Based on the uncontroverted facts, the defendant cannot argue that he did not "select" any victim for racial reasons.    In *United States v. Woodlee*, 136 F.3d 1399, 1414 (10th Cir. 1998), one defendant, who pled guilty to a civil rights conspiracy, argued that he did not "select" any victim and that the hate crime enhancement was therefore inapplicable.    The evidence showed that he did not participate in any racial taunting of the victims and only joined the other defendants towards the end of the offense.    *Id.*    The Tenth Circuit rejected this claim as "inconceivable."    *Id.*    "The only logical reason to chase and shoot at these men was their race. We do not believe simply because the other defendants made the initial decision whom to taunt [that] Mr. Kinslow is relieved of his choice to join in the melee."    *Id.*    So too here.    It simply

18

beggars belief that a white supremacist leader is arguing that the facts fail to establish that he joined and remained a member of this conspiracy to commit a hate crime.    The defendant joined and actively participated in this conspiracy to further his white supremacist beliefs.    This conspiracy did just that when conspirators targeted individuals based on their race and religion. The defendant therefore cannot escape the application of the hate crime enhancement when he actively took part in a conspiracy with like-minded white supremacists who targeted minorities through swatting calls.

      B.    The § 3A1.2(a) Enhancement (Official Victim) Applies in this Case Because the Conspirators Targeted Government Officials and the Criminal Information Makes Clear that the Conspirators were Motivated by the Status of Government Officials When They Swatted Such Officials

Under § 3A1.2(a) of the Sentencing Guidelines, there is a three-level increase if the victim was "a government officer or employee" and "the offense of conviction was motivated by such status."    Further, should the facts support the application of § 3A1.2(a) then a six-level increase is appropriate because the offense of conviction is from Chapter Two, Part A (Offenses Against Persons).    Here, the facts establish beyond a preponderance of the evidence that the conspirators targeted government officials to swat and did swat a United States Cabinet member. Once again, the defendant ignores the facts set forth in the Criminal Information and Statement of Facts to avoid the application of a guideline provision and to underplay the seriousness of this conspiracy.

First, as set forth in the Criminal Information and Statement of Facts, the conspirators in this case targeted government officials.    The Criminal Information states the following:

      From in and around October 2018, the conspirators maintained a dark net site known as DoxBin. The site was a repository of personally identifiable information of potential and past swatting targets.    The DoxBin website primarily targeted

government officials, executives, journalists, and celebrities.

Dkt No. 37 at pg. 6.

The Statement of Facts then details that the defendant was aware of DoxBin because he "took

part in doxing individuals."   Dkt No. 40 at pg. 7.   This is significant because the Statement of

Facts also detail that the conspirators often placed a gun next to an individual's name on DoxBin

when they successfully targeted the individual.   *See id.*   Thus, the uncontroverted facts

establish that the conspirators targeted government officials to swat.

Second, it is uncontroverted that the co-conspirators swatted a sitting United States

Cabinet member.   Again, this event is included in the Criminal Information.   Dkt. No. 37 at

pg.6.   The facts therefore establish that (1) a government official is a victim and (2) the

conspirators actively doxed and sought to swat government officials.   Thus, the only conclusion

supported by the evidence is that the conspirators successfully obtained the Cabinet member's

home address and targeted the Cabinet member because of their official position.

Finally, the evidence does not have to establish that the defendant personally knew or

chose the Cabinet member to swat.   Unlike § 3A1.1(a), this provision does not include language

requiring proof that the defendant chose the government official to swat.   Here, there is no

doubt that the defendant was a member of a conspiracy that targeted government officials and

that he knew his fellow conspirators targeted government officials.

III.   Analysis of Sentencing Factors

In addition to the properly calculated guideline range, this Court is also required to

consider the sentencing factors identified in 18 U.S.C. § 3353(a).   Those factors weigh in favor

of imposing a sentence of 60 months of imprisonment.   Further, should this Court determine

that the properly calculated guideline range is below 51 to 60 months, the sentencing factors

articulated below also counsel for an upward variance in this case.

A.    The Defendant's Actions Caused Severe Suffering

First, and most importantly, the defendant's actions caused severe emotional suffering to

the Victim and his family.    In executing a swatting call against the Victim, the defendant was

motivated by his desire for revenge against a journalist whose only offense was reporting on the

defendant's role in the Atomwaffen Division, which was already then a group associated with

several homicides.    By exacting his revenge, the defendant not only harmed the Victim and his

wife but also the Victim's young son.    As vividly detailed in the Victim impact letter, the

Victim's young son had nightmares about the incident and continues to have awful dreams of

neo-Nazis kidnaping his family and murdering his father.    It has also prompted the Victim's

young son, who is Mexican American, to ask, "Why do Nazis hate brown people like me."    It is

simply heartbreaking that a young child is asking such questions and has been forced to flee his

home with his parents because of fear of being violently attacked.

Second, the defendant harmed our own community and other communities across our

country.    The defendant was an active participant in the most far-reaching swatting conspiracy

in our nation to date.    The defendant and his conspirators made at least 134 swatting calls across

the United States and other nations causing substantial disruption to government services and

severe emotional suffering.

The defendant and his conspirators victimized universities, schools, places of worship,

and individuals.    In several instances, universities, schools, places of worship, and even a small

community were forced to shelter in place.    In our own district, the conspirators targeted ODU

21

and caused the entire campus to shelter in place.   As ODU stated in its victim-impact letter, the conspirators' actions "resulted in undeniable disruptions to the ODU community, created anxiety, and traumatized students and their parents as well as resulted in egregious utilization of university, state, and municipal resources."

Even more insidiously, the defendant knowingly and actively took part in this conspiracy because it targeted individuals because of their race and religious beliefs.   Let's be clear, the conspirators committed hate crimes against individuals and a church located a mere mile from this courthouse.

The victim-impact letter written by the Alfred Street Baptist Church conveys the extreme harm caused by the conspirators.   In early November 2018, parishioners were forced to shelter in place while law enforcement searched for bombs within their house of worship.   This swatting event has caused lasting harm to parishioners, who knew then and know now that they were targeted because their church is predominately African American.   As the Church stated in their letter, "the bomb threat highlighted the scary reality that many Black and Brown people face every day and paralleled the historical threats against people of color in this nation."   And, that the conspirators "sought to terrorize a community they did not know.   They sought to scar us because of our faith and our race."   Sadly, to this day, parishioners feel less safe and now deal with bag checks and property sweeps.

Nor, was this the only predominantly African American church that was targeted.   To the contrary, on December 28, 2018, the conspirators also swatted the First Reformed Church in Schenectady, New York.   In response to this threat, multiple law enforcement agencies were called in and officers swept inside of the church and searched the surrounding area.

Moreover, on the same day the conspirators called in the bomb threat against the Alfred Street Baptist Church, they also called in a bomb threat against the Dar El-Eman Islamic Center in Arlington, Texas.   On that day, the conspirators claimed to have a bomb and threatened to kill everyone inside the mosque.   In response, law enforcement and fire investigators responded to the mosque where congregants were gathered for a family-night event with the Arlington police.

The above events cover a small portion of the hundreds of swatting calls made in furtherance of this conspiracy.   Conspirators coordinated almost all these calls in the Graveyard channel and, to a lesser extent, the Siege Culture channel, which the defendant controlled.   By all accounts, the defendant participated in the swatting calls and even admitted that he used a voice changer during such calls.   It is therefore imperative that the defendant's sentence reflect the severe emotional harm that his actions have caused the Victim and his family and other individuals in our District and across our nation.

B.    The Defendant's Actions Harmed Society

The defendant through his actions harmed society.   Our nation's history reflects a long struggle to achieve the ideals enshrined in our Constitution.   Along this journey, our nation has, at points, taken steps forward but also steps back.   When Americans target other Americans based on race, religious beliefs, or other individual characteristics, we are *all* harmed.   Such actions, if left unpunished, signal an acceptance that such malevolent conduct is the norm and not the exception.   By knowingly taking an active part in a conspiracy that targeted individuals and institutions for racial and other impermissible reasons, the defendant sought to cause our community to take a step back in its progress towards achieving equality.

23

The conspirators also disrupted the provision of government resources in countless communities.   In our community, Alexandria deployed its bomb squad and other resources to ensure the safety of the Alfred Street Baptist Church.   Also, in our own District, ODU was forced on two occasions to deploy substantial resources to search and clear buildings.   Further, the defendant through his own actions caused the NYPD and Contra Costa Sheriff's Office to commit significant resources.   Further, countless other communities across our nation were forced to take similar measures.   For instance, one small community was forced to shelter in place.   In addition, Grand Rapids, Minnesota, was forced to divert resources from medical calls to support a swatting call placed against Old Central School.

The defendant's sentence therefore must reflect this serious harm that his conduct inflicted on our society.

C.    The Defendant's Sentence Must Deter Both Him and Other Like-Minded People

Third, and it goes without saying, that this case strongly implicates the need to impose a sentence that will deter both the defendant and other like-minded people.   First, swatting is increasingly a nationwide problem.   Each year, the number of swatting incidents has increased, and in Wichita, Kansas, resulted in a man dying.   There is therefore an urgent need to send a message that such criminal conduct is serious and will be punished.

Second, the Federal Bureau of Investigation reported in 2019, that hate crimes were at their highest levels in more than a decade.   This conspiracy therefore represents the use of a dangerous means, swatting, to commit a dangerous end, racial violence.   The defendant's sentence therefore must serve as a warning to other white supremacist group members that though they may take part in constitutionally protected speech, they cannot target individuals

24

because of their race, religion, or other impermissible reason.    Unfortunately, this is a message
that needs to be sent right now to a growing number of individuals who feel comfortable
committing illegal and violent acts against their fellow Americans because of their race, religion,
or other protected characteristic.    The Court's sentence must therefore send the much needed
message that ours is a society of laws and that individuals who engage in dangerous and hateful
crimes will receive stiff but fair punishments.

Third, the defendant must be specifically deterred from returning to criminal conduct
when he is released from custody.    While the defendant has a constitutional right to express his
hateful views, he does not have a right to express his views by targeting individuals because of
their race or religious beliefs.    Further, during this time, the defendant was roommates and close
friends with Kaleb Cole.    Federal authorities arrested both the defendant and Cole on the same
day.    Cole is charged in the Western District of Washington for his role in conspiring to deliver
threatening posters to journalists and advocates.    (Case No. CR 20-032) (WDWA).    Cole is
still pending trial.    Two of his fellow conspirators have pleaded guilty to charges of conspiring
to mail threating communications, stalking, and to interfering with federally protected activities.
The Court's sentence must therefore specifically deter the defendant from again crossing the line
or associating with others crossing the line from constitutionally protected speech to criminal
threats.

D.    <u>The Defendant's Sentence Must Avoid Unwarranted Sentencing Disparities</u>

In all cases, it is important that the sentence imposed not result in unwarranted sentencing
disparities.    This Court sentenced Kelley to 33 months of imprisonment.    And, while Kelley
was arguably more essential to the conspiracy because he hosted the Graveyard channel and

chose more targets, Kelley was also far younger, had a difficult childhood, unsupportive parents, and suffered from autism (though, Kelley was high functioning). In contrast, the defendant is much older than Kelley and grew up in a loving and supportive family. Further, he does not suffer from any cognitive or mental handicaps. Also, and perhaps most importantly, the defendant has been a committed white supremacist for a number of years and associated with other white supremacists, who appear to have crossed the line from constitutionally protected speech to unlawful threats against others. When taking these factors together, the defendant is not only more culpable than Kelley but also poses a far greater threat to society.

Further, this Court in *United States v. Rust*, 1:17-cr-290, sentenced an Alexandria man to 33 months of imprisonment for posting a threat online to murder African Americans at Howard University. In *Rust*, the defendant also pleaded guilty to transmitting an interstate threat to injure and faced a maximum punishment of 60 months of incarceration.

The defendant's conduct in this case is more serious for several reasons. First, here, the defendant personally targeted the Victim and his family and carried out the threat. Second, the conspirators in this case called law enforcement and issued not one but more than 134 interstate threats to injure. Third, the defendants caused individual harm when they forced universities, schools, places of worship, and a small community to shelter in place. And, most importantly, the conspirators on several occasions targeted individuals and institutions based on their race and religious beliefs.

For these reasons, the defendant should receive a higher sentence than both Kelley and Rust.

IV.     <u>An Upward Departure would be Warranted in this Case</u>

Should this Court conclude that the sentencing guideline range is lower than 51 to 60 months of incarceration, this Court should still impose a sentence of 60 months of incarceration because an upward departure is warranted in this case.

While departures should be rare, this is an atypical case lying outside the "heartland" of conduct covered by the guidelines.   *See* U.S.S.G. Ch.1, Pt.A(1)(4)(b).   The Court may upward depart from the guidelines in several situations, including for reasons articulated in specific guideline provisions.   Here, Application Note 4 to § 2A6.1 states that an upward departure may be warranted in cases with "multiple victims."   The Commission also noted "that offenses covered by this guideline may include a particularly wide range of conduct and that it is not possible to include all of the potentially relevant circumstances in this offense level."   *Id.* And, that the Court may consider "[f]actors not incorporated in the guideline" when "determining whether a departure from the guidelines is warranted."   *Id.*   This is such a case.

Here, the guidelines fail to properly account for the sheer breadth of the conspiracy, the number of victims, the extreme emotional suffering caused by the conspirators, the hate crimes committed by the conspirators, and the pecuniary harm suffered by communities across the country.   For these reasons, and other reasons that the United States will articulate in Court, an upward departure would be appropriate in this case.

V.      <u>Conclusion</u>

Considering the seriousness of the defendant's misconduct, a term of 60 months of imprisonment is appropriate.   Such a sentence would account for the harm the defendant caused to the Victim and his family, ProPublica and its other employees, universities, schools,

communities, and individuals, and send a message to other white supremacists that threats and

hate crimes have no place in our society.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By:    _____/s/_____
Carina A. Cuellar
Assistant United States Attorney
Eastern District of Virginia
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone:   (703) 299-3700
Fax:      (703) 299-3980
E-mail:   carina.cuellar@usdoj.gov