**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v.                                                             ) | **Criminal No: 1:20cr154** |
| ) | **The Honorable Liam O'Grady** |
| JOHN CAMERON DENTON      ) | |
|     Defendants.                  ) | |

**DEFENDANT'S POSITION WITH RESPECT TO SENTENCING**

The defendant, John Cameron Denton, by and through undersigned counsel, pursuant to 18 U.S.C. §3553(a) and §6A1.3 of the United States Sentencing Guidelines (hereinafter U.S.S.G.), submits the following Position with Respect to Sentencing. In accordance with U.S.S.G. §6A1.2 Counsel certifies that he reviewed the Presentence Investigation Report (hereinafter PSR) with Mr. Denton. Further, Mr. Denton objects to the determination that he qualifies for a hate crime motivation enhancement pursuant to U.S.S.G. §3A1.1 and an official victim enhancement pursuant to U.S.S.G. §3A1.2. As a result, the appropriate Total Offense Level is 15 with a corresponding guideline range of 18 to 24 months under Criminal History Category I. This guideline range adequately addresses certain specific characteristics of Mr. Denton and it is an appropriate measure of his culpability in the present case. Based on the considerations set forth in 18 U.S.C. §3553(a), Mr. Denton requests that this Court impose a sentence at the low end of this guideline range. A sentence of 18 months followed by a three-year term of supervised release to include ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓ and, if the Court deems appropriate, a term of home confinement with a parent or grandparent, is sufficient, but not greater than necessary, to address these considerations.

**I.      Background**

In and around 2018, John William Kirby Kelley ("Kelley") (1:20-cr-82) began hosting the #Graveyard Internet Relay Chat ("IRC") channel (the "Graveyard channel") on the Clearnet which was accessible by simply typing the domain into Google. An IRC is similar to a chat room that allows individuals to communicate on a one-on-one basis or in group forums. The Graveyard channel was hosted on a server called Deadnet. Kelley's Graveyard channel was rife with sophomoric, vulgar, and racist dialogues. In August of 2018, the channel took a sinister turn after Kelley invited Co-Conspirator 1, a Canadian citizen, Co-Conspirator 2, a British citizen, and Co-Conspirator 3, an American citizen who was a juvenile at the time. The swatting calls began a short time after.

After the swatting calls were underway Kelley invited Mr. Denton to join in October of 2018, who a short time later began hosting and managing his own IRC channel called Siege Culture. The Siege Culture channel was devoted to the racist writings and teachings of James Mason. While some members of the Siege Culture channel also participated in the Graveyard channel, swatting targets were not selected, planned, or coordinated on the Siege Culture channel.

The majority of the swatting calls were made between October 2018 and February 2019. Co-Conspirator 1 and Co-Conspirator 2 were responsible for making the vast majority of the swatting calls. Co-Conspirator 2 was also the host of DoxBin dark net website. They asked other participants on the Graveyard channel to propose targets and then choose from the options presented to them. The co-conspirators would then use the Mumble application to listen to the calls. As the Graveyard channel host and moderator, Kelley was a frequent participant and listened to and took part in countless swatting calls. He was also responsible for inviting many participants. When law enforcement executed a search warrant on Kelley, a voice changer was

located in his room. After starting the Siege Culture channel, Mr. Denton rarely, if at all, participated in chats on the Graveyard channel and remembers listening to approximately less than 10 calls on Mumble.

On or about November 3, 2018, Co-Conspirator 3, who later cooperated with the government, chose the Alfred Street Baptist Church, located in Alexandria, Virginia, because it is a predominantly African American church. He then coordinated with Co-Conspirator 1 who made the swatting call. The following day, after listening to a swatting event, Kelley suggested swatting Old Dominion University to Co-Conspirator 1 in addition to other locations. In the early morning of November 29, 2018, Kelley made the swatting call to ODU. Even after being approached by law enforcement Kelley made a second swatting call to ODU on December 4, 2018. On January 27, 2019, a co-conspirator placed a swatting call that targeted a USSS protectee, who was then a United States Cabinet member. However, after law enforcement contacted the USSS and confirmed that the cabinet member was safe no further law enforcement action was taken. Mr. Denton did not suggest, plan, or participate in any of the above swatting events.

Co-Conspirator 3 introduced Mr. Denton to Co-Conspirator 2 online after learning that Mr. Denton was angry with a journalist at ProPublica for publishing his identity and mischaracterizing his role in Atomwaffen Division. According to Co-Conspirator 3 and other evidence, Mr. Denton targeted the journalist because of the article and because the journalist approached Mr. Denton at a music festival for an upcoming news series. On December 14, 2018, Mr. Denton participated in a swatting call made by Co-Conspirator 1 that targeted the ProPublica office. Police found a single employee in the office who was shaken but not harmed. On February 8, 2019, Mr. Denton participated in a swatting call made by Co-Conspirator 2 that

targeted the home of the journalist. At the home, police encountered the journalist, spouse, child and a relative who were visibly shaken but not harmed.

On February 25, 2020, a criminal complaint was filed in this district charging Mr. Denton with conspiracy to transmit threats to injure the person of another. Mr. Denton was taken into custody the following day in the Southern District of Texas and has remained in the custody of the U.S. Marshalls. On July 14, 2020, Mr. Denton appeared before this Court and pled guilty, pre-indictment. At the time of sentencing, Mr. Denton will have been in custody for approximately fourteen months and one week.

## II.     Disputed Factors

Pursuant to §6A1.3 of the Sentencing Guidelines the Court shall resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(i), Fed. R. Crim. P. When any factor is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the Court regarding that factor. The government bears the burden of proving the applicability of a sentencing enhancement. *See, e.g., United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014).

### A.     Hate Crime Motivation

In the present case, the Probation Officer noted in paragraph 60 of the PSR that Mr. Denton qualifies for a victim related adjustment for hate crime motivation pursuant to U.S.S.G. §3A1.1(a). However, notwithstanding the motivation of other co-conspirators, Mr. Denton did not select any victim based on race or religion.

Subsection 3A1.1(a) imposes a higher standard on the court for imposing this enhancement. It requires the court at sentencing to determine beyond a reasonable doubt that a defendant intentionally selected any victim or any property as the object of the offense of

4

conviction because of the race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person.

As discussed above, Co-Conspirator 3 selected the Alford Street Baptist Church because it was predominantly African American. He then enlisted the assistance of Co-Conspirator 1 to make the swatting call. Co-Conspirator 3, who cooperated with law enforcement, made no mention of discussing this selection with Mr. Denton. In fact, Co-Conspirator 3 told law enforcement that the swatting targets that Mr. Denton did select were chosen because he was angry with the journalist.

The government relied on *United States v. Woodlee*, 136 F.3d 1399, 1414 (10th Cir. 1998), where a defendant did not participate in racial taunting and only joined in chasing and shooting at men at the end of the offense. The court in *Woodlee* did not believe that simply because the other defendants made the initial decision whom to taunt that the defendant is relieved of his choice to join in the melee. *Id.* Unlike the defendant in *Woodlee*, there is nothing to indicate that Mr. Denton otherwise participated or joined in the swatting call. In fact, Mr. Denton did not suggest, discuss, or participate in the swatting calls to the two predominately African American Churches nor the Islamic Center that the government references in its position, and he did not make any statements to law enforcement to the contrary. The government speculates that Mr. Denton discussed swatting targets based on racial animus on the Siege Culture channel, however this is incorrect as described above and the government acknowledges that it was unable to obtain any chat logs from the Siege Culture channel.

The language in the Statement of Facts was chosen carefully and agreed to by the parties. Nowhere in the Statement of Facts does Mr. Denton agree or stipulate that he selected a swatting

5

target based on racial animus. Although not binding on this Court or the Probation Officer, it is also noteworthy that the government did not require Mr. Denton to stipulate to this enhancement.

Mr. Denton's conduct also stands in contrast to Kelley's where this Court denied the same objection. There the government argued that Kelley was critical to the conspiracy, Mr. Denton certainly was not. Mr. Kelley was the host and manager of Graveyard channel, he participated on the channel regularly, actively discussed potential swatting targets, and worked to obtain video feeds. Mr. Denton did not.

### B. Official Victim

The Probation Officer noted in paragraph 61 of the PSR that Mr. Denton qualifies for a victim related adjustment for an official victim pursuant to U.S.S.G. §3A1.2. This enhancement does not have the higher standard required for the hate crime enhancement. Clearly, Mr. Denton was a member of this conspiracy and the conspiracy selected a USSS protectee because of their position. However, as discussed above, Mr. Denton was responsible for selecting two targets of over 134 swatting calls. He participated by listening to less than ten of the swatting calls and generally did not participate in the chats on the Graveyard channel. While he was familiar with DoxBin, Co-Conspirator 2 was the manager of the site. Mr. Denton did not suggest, discuss, or participate in the swatting call of the USSS protectee whatsoever. Mr. Denton's involvement in the conspiracy is simply too attenuated to qualify for this enhancement. In the alternative, under the §3553(a) this 6 level enhancement overstates Mr. Denton's culpability and warrants a sentencing variance.

## II. Considerations Under §3553(a)

It is well settled that the Sentencing Guidelines are advisory following the Supreme Court's decision in *United States v. Booker*, 125 S.Ct. 738, 757 (2005). While Federal Courts

6

must still consider the defendant's sentencing exposure under the guidelines, the court is now free to "tailor the sentence in light of other statutory concerns". *Booker*, at 764-65; see also *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) (the court shall consider the sentencing guidelines range as well as other relevant factors set forth in 18 U.S.C. §3553(a) before imposing sentence). As a result, this Court may consider permissible statutory factors such as: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from future crimes of the defendant, and to provide the defendant with reasonable rehabilitative opportunities; the kinds of sentences available; the guideline range; the need to avoid unwanted sentencing disparities; and the need for restitution. Upon consideration of these factors, a sentencing court may find that a case falls outside the "heartland" contemplated by the guidelines, that "the guidelines sentence itself fails properly to reflect the §3553(a) considerations", or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 345-46 (2007). Under recent decisions of the United States Supreme Court, *see e.g., Gall v. United States, 552 U.S. 38 (2007); Kimbrough v. United States, 552 U.S. 85 (2007)*; and the United States Court of Appeals for the Fourth Circuit, *see e.g., United States v. Pauley, 511 F.3d 468 (4th Cir. 2007)*; other considerations exist that demand a lower sentence than that suggested by the Sentencing Guidelines. Therefore, if this Court considers Mr. Denton's offense in the context of these factors, it is appropriate to impose a sentence of 18 months followed by a three-year term of supervised release to include ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and, if the Court deems appropriate, a term of home confinement with a parent or grandparent.

A.     **Nature and Circumstances of the Offense**

Mr. Denton's involvement in the conspiracy lasted for approximately four months. Kelley invited Mr. Denton to join the Graveyard channel after the swatting was underway. However, Mr. Denton quickly turned his attention to developing his own Siege Culture channel and moderating the chatroom. As a result, Mr. Denton seldom, if ever, participated in the Graveyard channel. Nevertheless, Mr. Denton remained involved in the conspiracy. He listened to or watched approximately less than ten swatting calls on Mumble. Mr. Denton's participation was also limited because he was employed full time.

Mr. Denton also selected two swatting targets because he was angry with a journalist at ProPublica for publishing his identity, mischaracterizing his role in Atomwaffen Division in an article, and approaching him at a music festival. After learning this, Co-Conspirator 3 introduced Mr. Denton to Co-Conspirator 2 online. This is significant because Co-Conspirator 2 was one of the most prolific swatters and managed the DoxBin site. On December 14, 2018, Mr. Denton listened as the New York office of ProPublica was swatted. Approximately seven weeks later, on February 8, 2019, Mr. Denton listened as the home of the ProPublica journalist was swatted. To the best of his recollection, this is the last swatting call that Mr. Denton listened to.

Following his arrest, Mr. Denton timely accepted responsibility for his actions and pled guilty pre-indictment. ███████████████████████████████████████ Mr. Denton regrets his actions and is remorseful for how they impacted the employee at the ProPublica office, and the family of the journalist. However, he is especially saddened by the impact his actions had on the journalist's child. Having experienced a similar police response at the time of his arrest, Mr. Denton has empathy for how traumatic the experience must have been for the victims.

B. **History and Characteristics of the Defendant**

Mr. Denton is 27 years old and while the PSR indicates that his upbringing was normal, in fact he faced numerous struggles that continued into adulthood. ███████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

███████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████ Mr. Denton had a positive experience with his middle school science teacher who nurtured an interest that resulted in Mr. Denton earning twelve college credits in science by the time he graduated from high school. Even after graduation, Mr. Denton maintained contact with his science teacher, ████████████████████, and was invited to co-lead lessons with the teacher.

████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

After graduation, Mr. Denton attended a local college but withdrew after obtaining employment ███████████████████████████ he continued to educate himself about computers and managing internet networks.  ████████████████████████ ███████████████████████████ Mr. Denton was a reliable and trusted employee and is able to return to work there upon his release.  ████████████████████████ ███████████████████████████████████████████████████ ██████████

███████████████████████████████████████████████████ ████████████████████████████████████████ He was initially exposed through his peer group in high school which progressed to his participation in Attomwaffen Division ("AWD") by the end of 2016 where he found an outlet for his interest in computers and internet networks.  He considered the members of this organization to be his friends and communicated with them predominantly online.

At the time of Mr. Denton's arrest, he had become disillusioned with the AWD ideology and began to distance himself from the group which was challenging because one of its members was his roommate and he still considered many to be his friends.  ████████████████████ ███████████████████████████████████████████████████

[Page content redacted]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

[Page content fully redacted]

███████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████

        ████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

    **4.**    **Bridges to Life**

████████████████████████████████

████████████████████████████████████████

██████████████, Mr. Denton completed the Bridges to Life self-study program during his incarceration to better understand how his actions affected the swatting victims that he suggested. Mr. Denton was the first inmate to complete the program which launched in the Alexandria Detention Center earlier this year.

Bridges to Life ("BTL") is a Texas-based non-profit founded in 1998 that provides a high-impact restorative justice program to incarcerated offenders. The BTL program has been conducted in 184 facilities, the curriculum has been used in 14 states and 6 foreign countries, and over 55,000 offenders have graduated from the program. Along with exploring concepts from confession to restitution in their fourteen-week program, offenders also hear from victims and face the true impact of crime on others. Notably, recidivism studies conducted by BTL with the assistance of the Texas Department of Criminal Justice reveal that over 83 percent of BTL graduates do not return to prison within three years, a 2020 study conducted by the National Police Foundation revealed that participation in the BTL program reduced recidivism by 30 percent.

### 5. Family and Community Support

[REDACTED]

### C. Equity, Fairness, and Deterrence

A sentence of 18 months followed by a three-year term of supervised release to include [REDACTED] and, if the Court deems

appropriate, a term of home confinement with a parent or grandparent would sufficiently reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from future crimes. Mr. Denton has no prior criminal history and has never been incarcerated prior to the instant offense. Mr. Denton has been incarcerated for fourteen months and, as the Court is aware, conditions in the Alexandria Detention Center have been especially difficult during the pandemic. Mr. Denton, along with the other inmates, were subjected to extended periods of lock-down and other movement restrictions and programs were cancelled. Nevertheless, Mr. Denton did not have any infractions during his incarceration. This sentence would certainly send a strong message to the community that swatting will be punished harshly and it sends a clear message to Mr. Denton that any future crimes will not be tolerated.

Mr. Denton's family and community provide a strong support system which, along with  Mr. Denton also completed the Bridges to Life program which dramatically decreases the likelihood for recidivism. This sentence would balance the dual purposes of incarceration to both punish and rehabilitate Mr. Denton while also minimizing the likelihood of recidivism.

D. **The Guideline Range / The Need to Avoid Sentencing Disparities**

A sentence of 18 months followed by a three-year term of supervised release to include ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and, if the Court deems appropriate, a term of home confinement with a parent or grandparent adequately reflects the

16

guideline range and avoids unwarranted sentencing disparities. First, Mr. Denton's sentencing guidelines increased by 9 points because of the hate crime and official victim enhancements. This resulted in his total offense level increasing from 15 to 24 which resulted in the low end of his guidelines increasing from 18 to 51months.  This dramatically overstates Mr. Denton's offense conduct especially in comparison to the offense conduct of his fellow co-conspirators.

      This sentence also avoids unwarranted sentencing disparities. Co-Conspirators 1 and 2 were responsible for making the vast majority of the swatting calls and Co-Conspirator 2 maintained the DoxBin.  Those individuals are the most culpable co-conspirators and yet will not face sentencing by this Court. Co-Conspirator 3, who will also not face sentencing in this Court, was actively involved on the Graveyard channel chats and in selecting swatting targets specifically the predominantly African American Church.  Co-Conspirator 3 also introduced Mr. Denton to Co-Conspirator 2 after he learned that Mr. Denton was angry with the journalist. Finally, Kelley who received a variant sentence of 33 months from this Court, was the host and manager of Graveyard channel, he participated on the channel regularly, actively discussed potential swatting targets, and worked to obtain video feeds. Kelley invited Mr. Denton to join the Graveyard channel after the swatting was underway. The government described Kelley as critical to the conspiracy. All of these individuals participated in the conspiracy for a longer period of time than Mr. Denton.

### III. Conclusion

      For the foregoing reasons, Mr. Denton respectfully requests that this Court find that the appropriate Total Offense Level is 15 with a corresponding guideline range of 18 to 24 months. In the alternative, Mr. Denton requests that this Court impose a variant sentence based on the factors described in 18 U.S.C. §3553(a) and impose a sentence of 18 months followed by a three-

year term of supervised release to include ████████████████████████████████

████████ and, if the Court deems appropriate, a term of home confinement with a parent or grandparent.

      Mr. Denton further requests that this Court recommended ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████

      Finally, Mr. Denton further requests that the Court recommend that he serve his sentence at at a facility near the northern Virginia area.

      Respectfully submitted,

      By: */s/ Andrew M. Stewart* .
      ANDREW M. STEWART, ESQ.
      Virginia State Bar No. 68683
      Attorney for the Defendant
      2007 North 15th Street, Suite 201
      Arlington, VA 22201
      Phone: 703-248-0626
      Fax: 703-248-8971
      andrew.m.stewart.esq@gmail.com

CERTIFICATE OF SERVICE

      I hereby certify that on the 30th day of April, 2021, I electronically filed the foregoing motion with the clerk of the court using the CM/ECF system, which will send an electronic copy to the following:

Carina Cuellar
Assistant United States Attorneys
U.S. Attorney's Office, Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: 703-299-3700

By: */s/ Andrew M. Stewart* .
ANDREW M. STEWART, ESQ.
Virginia State Bar No. 68683
Attorney for the Defendant
2007 North 15th Street, Suite 201
Arlington, VA 22201
Phone: 703-248-0626
Fax: 703-248-8971
andrew.m.stewart.esq@gmail.com